# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

_____

JOANN CORSO,

                            Plaintiff,                  1:16-cv-01488 (BKS/ML)

v.

NEW YORK STATE DEPARTMENT OF
CORRECTIONS & COMMUNITY SUPERVISION,

                            Defendant.

_____

**Appearances:**

*For Plaintiff:*
Michael H. Sussman
Jonathan R. Goldman
Sussman & Associates
1 Railroad Avenue, Suite 3
P.O. Box 1005
Goshen, NY 10924

*For Defendant:*
Letitia A. James
Attorney General of the State of New York
Aimee Cowan
Assistant Attorney General
615 Erie Boulevard West, Suite 102
Syracuse, NY 13204

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiff Joann Corso, a correction officer at the New York State Department of

Corrections and Community Supervision ("DOCCS"), brings this action alleging that DOCCS

discriminated and retaliated against her on the basis of her gender in violation of Title VII of the

Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"). (Dkt. No.

18). The parties understand the Amended Complaint to assert three claims under Title VII: (1) hostile work environment; (2) employment discrimination; and (3) retaliation. (Dkt. Nos. 33-29, 40). Defendant moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 33). For the reasons stated below, the motion is granted.

## II. FACTS[1]

### A. Plaintiff's Employment at Ulster

Plaintiff, who has served as a DOCCS correction officer since 1998, started working at Ulster in November 2015. (Dkt. No. 33-28, ¶¶ 1–2). Ulster is a reception center that processes inmates from local jails and state facilities before their transfer to other state facilities for longer-term placement. (*Id.* ¶¶ 3–4). At Ulster, Plaintiff worked as a resource officer—an employee who fills in for an officer that is out sick, on vacation, or absent for another reason—until July 2017. (*Id.* ¶¶ 6–8).

### B. Assignment to the Draft Unit

In February 2016, Plaintiff asked to fill a two-week-long absence in the draft unit ("draft" for short) beginning on Monday, February 29, 2016, (Dkt. No. 33-28, ¶ 10; *see* Dkt. No. 33-2), because the officer holding the permanent position was out on leave, (Dkt. No. 33-9, at 53). Plaintiff requested a draft position because it meant that she could have weekends off and visit her ill father three hours away. (Dkt. No. 33-9, at 43–44). If not for the benefit of having weekends off, she would have ranked an assignment in draft in "last position" because, based on conversations with other female officers, she understood the draft unit to be a hostile

---

[1] The facts have been drawn from Defendant's statement of material facts, (Dkt. No. 33-28), Plaintiff's response and counterstatement of material facts, (Dkt. No. 40-1), and the attached exhibits, depositions, and declarations. The Court has also referenced allegations in the Amended Complaint where necessary to provide context for the record evidence. The facts are taken in the light most favorable to Plaintiff.

environment for women, as male officers in the draft unit did not want female officers working there. (Dkt. No. 33-9, at 44–47).

At that time, the draft unit comprised six bid posts for the day shift: an officer in the bag room, who also assists with strip frisks of inmates; a desk officer; and four general-purpose officers responsible for, among other duties, escorting inmates from the housing unit to the buses or the mess hall, monitoring inmates at the mess hall, strip-frisking inmates arriving or leaving the unit, and running the medication table. (*Id.* ¶¶ 15–17, 19). On the morning of February 29, 2016, the most senior officer in the draft unit was Paul Steers, who served as desk officer. (*Id.* ¶ 18). Alex Melnick was working the bag room. (Dkt. No. 33-12, at 14). The other draft officers were Barry Belfance, James Jamrozy, and Chan Edwards. (*See* Dkt. No. 34-8, at 15). The same individuals worked in draft on March 2, 2016, except for Melnick. (*Id.*).

Lieutenant Jason Callender, who was in charge of staffing, granted Plaintiff's request to be placed in draft, partly based on her seniority. (Dkt. No. 33-28, ¶ 14; Dkt. No. 33-10, at 20, 23, 29). But Plaintiff asserts that Callender never contacted her. (Dkt. No. 33-9, at 52). Instead, she learned of her assignment on Thursday, February 25, 2016, from Belfance, who was working in the bag room. (Dkt. No. 33-9, at 52, 55, 60; Dkt. No. 33-20, at 42; Dkt. No. 34-5, at 1). According to Plaintiff's testimony, Belfance warned that maybe she should "not do it" because, as a woman, she could not strip-frisk inmates and she might be assigned to the draft desk; since Steers usually picked that position, as he was entitled to do based on his seniority, it "would get Steers very mad" if Plaintiff were assigned to the draft desk. (Dkt. No. 33-9, at 56–58, 66–67). Belfance told her that "it might be better if [she] didn't take a bid down" in the draft unit and that, given her inability to perform strip frisks, she "might push somebody off of a job by their

seniority and by their bid" and "they'd have to work through a . . . lower position." (Dkt. No. 33-20, at 41–42).

Asked at his deposition whether he had heard that male officers did not want female officers in draft, Sergeant Michael Lee—an assistant watch commander at Ulster responsible for overseeing the daily charts and job assignment of resource officers at the facility[2]—stated:

> Well, they would prefer not to have females down there because of the stripping and stuff involved. The problem they have in their job description, it doesn't state whether they do strip frisking or not. So, essentially, you can have five women and one guy down there, and that wouldn't work because one person stripping 180 inmates would take all day.

(Dkt. No. 33-11, at 8–13, 58–61). Because of the strip-frisking problem, Lee explained that management was in the process of making draft bids male only. (*Id.* at 58–59). As a draft sergeant, he also preferred having male officers working in draft because "[i]t makes more sense to have male officers doing male jobs that need to be completed." (*Id.* at 60–61). He clarified, however, that no one in draft had specifically expressed that sentiment to him. (*Id.* at 69–70).

After her conversation with Belfance, Plaintiff spoke to Steers. (Dkt. No. 33-9, at 59, 67). She told him, "I'm not trying to take your job or anything. I'll do whatever you guys don't want to do . . . . Whatever jobs that yous [sic] don't want to do, I will do because I know I cannot strip frisk." (*Id.* at 67). He told her to "just come in five [a.m.] to one [p.m.]" on Monday. (*Id.* at 59).

On Friday, February 26, 2016, Plaintiff wrote a memo to Callender, stating:

> I was informed that I was penciled into the draft post and that being a female it would cause a problem for male seniority officers. Female officers have had draft bids in the past. I am devasted [sic] but I know it would be in my best interest to be taken out of the draft post rather than face a hostile work environment.

---

[2] Lee testified that he served as the nighttime "chart sergeant" before March 2017 and has served as daytime chart sergeant since then. (Dkt. No. 33-11, at 9–11).

(Dkt. No. 34-5, at 1). She placed the memo into Callender's mailbox the following Monday morning, February 29, 2016, before her draft unit shift started at 5:00 a.m. (Dkt. No. 33-9, at 55–56, 63). Given the timing, Plaintiff "knew that it was probably going to be too late" and that she "was going to have to spend a day there" in the draft unit. (*Id.* at 57, 60).

Plaintiff did not receive any training before starting in the draft unit. (Dkt. No. 33-9, at 52). As soon as she reported to the draft unit, Plaintiff felt hostility "right away." (*Id.* at 63). According to her testimony, "nobody was saying a word to me what I was going to do. . . . I asked what am I supposed to do and they just didn't even answer me." (*Id.*). She asked Steers if she would be working the desk, and he said no. (*Id.* at 64). Plaintiff and other draft officers went to the mess hall to supervise the inmates, and one of the officers asked her to "stay outside" and direct outgoing inmates to the laundry area. (*Id.* at 69–70). As Plaintiff further testified, after the inmates "were done with laundry, we all walked to the back and went to draft because these inmates have to now get ready to be strip frisked." (*Id.* at 70–71). Only male officers, however, may strip-frisk inmates. (Dkt. No. 33-28, ¶ 20). Plaintiff volunteered to "do the medicine table." (Dkt. No. 33-9, at 71). When she grabbed a big wooden table to set up, the officers told her "that's not the table you use, really nasty," so she "took another table up." (*Id.*).

As she was working the medication table, two inmates came up to her and said, referring to the draft officers, "[Y]ou got to hear what these guys are saying about you. . . . [W]e don't even want to say it, it's so nasty." (*Id.* at 72–73, 81). She responded that she could imagine, but they said, "[N]o, you can't." (*Id.* at 81). They added, "[T]hey really hate females, don't they?" (*Id.* at 82). Plaintiff "was getting very upset," and she handed the medicine bags to one of the inmates. (Id. at 73). "[A]fter that," she recounted, "I was lost the rest of the day. . . . [W]hatever

they told me to do I did, but they didn't tell me much." (*Id.*). At one point, the sergeant told her she was "supposed to be out in the hall," and she went. (*Id.*).

Plaintiff mentioned two specific confrontations that happened in draft during her assignment there. Because of her experience as an I.D. officer, Plaintiff offered to "do I.D." (*Id.* at 85). Edwards rebuffed her: "You're not getting my code . . . . I ain't showing her nothing." (*Id.* at 85–86). According to Plaintiff, Edwards "gives you nasty looks when you're in draft, especially if you're passing." (*Id.*). Later, when inmates had to be escorted, one of the draft officers—she believed it was Edwards—yelled out, "[L]et her escort, she got two fucking legs. Let her go fucking escort. Why are you going to go out and do it?" (*Id.* at 86–87). Plaintiff complied and escorted the inmates in the rain. (*Id.* at 74). According to Plaintiff, no one other than Steers or Edwards engaged in discriminatory conduct toward her that day. (Dkt. No. 33-28, ¶ 41). At the end of her shift, she went home, "[v]ery upset." (*Id.*). Plaintiff did not make a complaint about how she was treated on her first day in draft, and she did not raise any issues with Sergeant Charles Madison, the day-shift draft sergeant. (*Id.* at 82; Dkt. No. 33-14, at 11–13).

On March 1, 2016, during her second day in draft, Plaintiff was approached by David Olejniczack, a transportation officer, while she was working the medication table. (Dkt. No. 33-9, at 83–84, 89). He said, "I see what they're doing to you," and offered to show her what to do, including calling out inmates and assigning them to bus-specific rooms. (*Id.* at 83–84, 89–90). To Olejniczack, it seemed that Plaintiff "needed direction" because she had "never worked the job before." (Dkt. No. 33-17, at 20). He did not see the draft officers giving her directions, so he felt he needed to help her. (*Id.* at 20–22). After working the medication table, Plaintiff spoke to transportation officers Javier Cortes, Robert Osterhoudt, and Howard Budd. (Dkt. No. 33-9, at

102). With tears in her eyes, she told them: "I did nothing to these guys, why are they doing this." (*Id.*). They responded: "[T]his has been happening forever. They don't want a woman back here." (*Id.*). She then said, "I'm just going to call Gillespie and get out of here." (*Id.*).

Halfway through her shift on the second day, Plaintiff called Sergeant Gillespie, the chart sergeant responsible for assignments before Lee took over in March 2017, and requested to be pulled from her post. (*Id.* at 100–01, 111–12; Dkt. No. 33-11, at 9–10). Gillespie told her to complain to her supervisor, draft unit sergeant Madison. (*Id.* at 103). Plaintiff had not spoken to Madison about her treatment in draft because she thought he was close to the other male draft officers. (Dkt. No. 33-9, at 82). Plaintiff also approached Callender, who similarly advised that she report up the chain of command to Madison since she had not yet spoken to nor had any issues with him. (Dkt. No. 33-28, ¶ 51; Dkt. No. 34-6). Accordingly, Plaintiff spoke to Madison, (*id.* at 103, 108), followed up with a memo explaining the situation, (Dkt. No. 33-9, at 103–04; *see* Dkt. No. 33-2), and handed Callender a written statement asking to be removed from the draft unit due to harassment and hostile work environment, (Dkt. No. 33-9, at 109–10; *see* Dkt. No. 34-6). Callender granted Plaintiff's request to be removed from the draft assignment, (Dkt. No. 34-4, ¶ 15), and reported Plaintiff's complaint to Captain Harold Moss, (Dkt. No. 34-6). Upon Moss' instruction, Callender gave Plaintiff a copy of the DOCCS workplace violence directive. (Dkt. No. 33-28, ¶ 53; Dkt. No. 34-4, ¶ 14; *see* Dkt. No. 34-7).

### C. Reporting of Alleged Discrimination

The next day, March 2, 2016, Madison submitted a memo to Lieutenant Green, the watch commander. (Dkt. No. 33-28, ¶ 46; *see* Dkt. No. 33-3). In his memo, Madison recounted his conversation with Plaintiff the day before, when he told her that "he was not aware of, nor has any other Officer approached me regarding complaints against females being assigned to the draft area." (Dkt. No. 33-3, at 2). He added:

> At no time did I witness any staff member or Officer being anything but professional to Officer Corso. Officer Corso was given instruction on the different aspects of her duties while assigned to the draft building by several draft Officers and transportation Officers. Also at no time did I hear any staff member or Officer say anything disrespectful or inappropriate toward Officer Corso; in the presence of other staff and/or inmates.

(*Id.*). Madison testified that he based his memo to Green on his own observations and his conversations with Melnick, Olejniczack, Curtis Frantz (a transportation officer), and an inmate porter. (Dkt. No. 33-14, at 43–44, 49). But he did not speak with or obtain memos from Steers, Belfance, Jamrozy, or Edwards; additionally, Madison acknowledged not being physically present for or inquiring about all the events described in Plaintiff's complaint. (*Id.* at 45–49, 52–59). Madison simply did not believe the allegations and did not think he needed to investigate any further. (*Id.* at 47).

On March 4, 2016, Plaintiff spoke with staff in DOCCS's Office of Diversity Management ("ODM"), and she was provided with an ODM complaint form and instructions by email. (Dkt. No. 33-28, ¶ 55; Dkt. No. 33-5, at 1). That day, ODM sent Plaintiff a letter stating that her "complaint alleging gender harassment by Correction Officer Chan Edwards and other unnamed Correction Officers" was "being reviewed to see it if [fell] within the purview" of ODM. (Dkt. No. 33-5, at 2). On March 5, 2016, Plaintiff filed a written complaint with ODM. (Dkt. No. 33-4). She checked the box for "Sexual Harassment" and claimed that Steers, Edwards, Belfance, and other correction officers in draft discriminated against her on February 29, 2016. (*Id.* at 2). Two days later, Plaintiff's attorney notified Ulster's superintendent that three

draft officers—Steers, Edwards, and someone named "Jambo"—had discriminated against her in the draft unit and that Madison had taken no remedial action.[3] (*See* Dkt. No. 40-6).

Plaintiff filed a charge with the U.S. Equal Employment Opportunity Commission ("EEOC") on July 6, 2016. (Dkt. No. 33-6). She checked the box marked "sex" as the basis of discrimination, but she left the box marked "retaliation" blank. (*Id.* at 1). The charge describes the male draft officers' "distinct animosity" toward her and their refusal to provide "basic assistance or guidance." (*Id.*). Further, according to the charge, inmates told her that male officers had "openly stated that they did not want females working in [the draft] unit"; she "directly overheard male officers mocking" her; and "the male officers have made clear their disdain for female officers." (*Id.* at 1–2). Lastly, the charge states that Ulster and DOCCS had failed to address her complaint to date. (*Id.* at 2). On October 21, 2016, the EEOC dismissed the charge, noting that it was "unable to conclude that the information obtained establishes violations of the statutes," while specifying that it did "not certify" DOCCS's compliance with the statutes. (Dkt. No. 33-7, at 1). The EEOC also advised Plaintiff of her right to sue within 90 days. (*Id.*). Plaintiff timely filed this action on December 13, 2016. (*See* Dkt. No. 1). On September 6, 2017, Plaintiff filed an Amended Complaint, which added retaliation claims. (*See* Dkt. No. 18).

Approximately a year after the March 2016 events, an ODM investigator collected statements from several DOCCS officers—including Steers, Callender, and Belfance—and had a phone conversation with Edwards.[4] (Dkt. No. 33-5, at 3–21; Dkt. No. 33-13, at 51–52). In one written statement, Kellianne Matheson wrote that she had served as a resource officer, "had no

---

[3] Although Plaintiff's counsel stated that a certain "Jambo," in addition to Steers and Edwards, had discriminated against Plaintiff, (Dkt. No. 40-6; *see also* Dkt. No. 18, ¶ 22), Plaintiff testified that it was the wrong name and he did not engage in discriminatory conduct against her, (Dkt. No. 33-9, at 80).

[4] Plaintiff denies that those interviews were part of an ODM investigation into Plaintiff's allegations because ODM purportedly closed its investigation when Plaintiff filed her complaint with the EEOC. (*See* Dkt. No. 40-1, ¶ 57, at 11–12). Nothing in the record, however, indicates that ODM closed its investigation.

concerns being a female in draft," and the "crew there took [her] under their wing."[5] (Dkt. No. 33-5, at 3–21).

### D.    Participation in Training and Assignments to Posts

In her Amended Complaint, Plaintiff asserts that Defendant retaliated against her for complaining about the alleged gender discrimination and hostile work environment in the draft unit. (Dkt. No. 18, ¶ 50). The alleged retaliation consisted in "disallowing plaintiff from participating in trainings and denying her requests for assignment to certain preferential shifts and posts" while "allowing less senior and less qualified male officers [to] participate in such trainings and assign[ing] such males officers to the shifts and posts plaintiff has requested." (*Id.*).

Trainings are important because they provide opportunities for officers to gain experience in different areas of DOCCS operations, advance their career, and obtain overtime. (*See* Dkt. No. 33-18, at 66–68). Further, correction officers value their seniority rights, including the ability to select preferred positions and job assignments based on seniority. (*See id.*, at 27–35, 63–64 (testimony of transportation officer Budd)). Indeed, under the collective bargaining agreement, job assignments and shift selection must "be made in accordance with seniority, provided the employee has the ability to properly perform the work involved." (Dkt. No. 40-3, at 4).

Lieutenant Michael Harms, who is the regional training lieutenant for a hub of seven facilities (including Ulster) known as the "Sullivan Hub," (Dkt. No. 33-28, ¶¶ 71–72), testified

---

[5] By contrast, Plaintiff testified that female officers, including Matheson and a certain Barbara Ring, complained among themselves about how male officers treated women in the draft unit. (*See* Dkt. No. 33-9, at 46–47, 69). Madison testified that no complaints were brought to his attention, and he did not reach out to female officers before writing his report. (*See* Dkt. No. 33-14, at 55–56).

Despite her experience in the draft unit in February 2016, Plaintiff requested to be assigned to the draft unit's baggage room in February 2017 and to the "squad 8 draft opening (CO R. Vasquez)" in April 2017. (Dkt. No. 34–9, at 1–2). At her deposition, Plaintiff stated that the baggage room is "on the other side" of the building, away from where the other draft officers work. (Dkt. No. 33-9, at 134). The squad 8 position involved staying in draft "maybe an hour." (*Id.* at 135). Plaintiff explained that she applied for these draft openings to get weekends off. (*Id.*).

that each facility has a training advisory committee responsible for ensuring that officers obtain the mandated number of training hours and for selecting candidates, (Dkt. No. 33-21, at 51–55). Harms stated that the facility captain typically participates in training advisory committee meetings, and he recalled that Moss, Ulster's captain, participated in training advisory committee meetings in 2016. (*Id.* at 55–56).

## 1.    FTO Training

According to the Amended Complaint, Plaintiff requested but was denied field training officer ("FTO") training in May 2016 despite her seniority. (Dkt. No. 18, ¶ 33). FTO training is for officers wishing to provide orientation to new employees joining a facility. (Dkt. No. 33-28, ¶ 69). On April 25, 2016, Harms sent a memo to his contacts at the facilities detailing that an FTO training program would be held on May 24, 2016 and requesting that each facility forward the names of interested employees by May 17, 2016. (*Id.* ¶ 70; *see* Dkt. No. 34-10). Harms typically allows five seats per facility but may accept more upon request; he "can teach as many as . . . the facility needs [him] to." (Dkt. No. 33-21, at 14–15). Employees' performance, time, or attendance issues may prevent them from participating, but there are otherwise no prerequisite qualifications to participate. (*Id.* at 15–20).

Asked about the selection process at Ulster, Captain Moss testified that he does not select FTO training participants and that applicants are referred to the deputy superintendent of security. (Dkt. No. 33-19, at 97–98). But, as noted above, Moss participated in training advisory committee meetings, and he acknowledged that the deputy superintendent likely consulted with him on the selection of FTO training candidates. (*Id.* at 98).

A day after the deadline, Plaintiff submitted a memo to Lieutenant Faliski, Ulster's training lieutenant, expressing interest. (*See* Dkt. No. 34-11). Other officers similarly applied

after the deadline. (*See* Dkt. No. 40-8). Despite being the third most senior applicant, (*see id.*), Plaintiff was not selected, (Dkt. No. 33-9, at 145–46).[6]

### 2. Disciplinary Training

On May 18, 2016, Plaintiff submitted a memo to Callender seeking training in "Disciplinary"—"when you do hearings." (Dkt. No. 33-9, at 62; *see* Dkt. No. 34-12). Plaintiff claims that "three or four people . . . with less seniority" were trained before her. (Dkt. No. 33-9, at 62). She ultimately received this training in March 2018. (Dkt. No. 34-4, ¶ 49; *see* Dkt. No. 34-23).

### 3. ION Training

On June 27, 2016, Plaintiff requested ION training, which teaches officers to use a machine that detects narcotics on individuals visiting a facility. (Dkt. No. 33-28, ¶ 79; *see* Dkt. No. 34-1, at 5). There is only one ION machine for the Sullivan Hub; it is brought to a facility on a random date and used by ION team members to scan visitors. (Dkt. No. 33-28, ¶ 81–82). Lieutenant Gerald Gardner supervises the Sullivan Hub's ION team. (*Id.* ¶ 80). When vacancies arise on the ION team, each facility provides a list of recommended staff members. (*Id.* ¶¶ 83–84). In June or July 2016, the ION team canvassed for new members from the facilities in the Sullivan Hub, including Ulster. (*Id.* ¶¶ 85–86). Ulster's deputy superintendent of security, Roy Snyder, recommended Plaintiff and seven other officers, listing them by rank and seniority. (*Id.* ¶ 87; *see* Dkt. No. 34-1, at 1). On July 18, 2016, Gardner responded to Snyder that he would

---

[6] Aside from the May 2016 FTO training, the record contains July 2016 memos from correction officers applying for a subsequent FTO training. (*See* Dkt. No. 34-13). Although none of these memos is from Plaintiff, she testified that trainings were not always announced. (Dkt. No. 33-9, at 140). According to a memo dated September 12, 2016, Harms planned an FTO "training/refresher for all current and new Facility Training Officers" on September 26, 2016. (Dkt. No. 34-14). In her response to Defendants' statement of material facts, Plaintiff argues that she could not apply because she was not a current or new FTO. (Dkt. No. 40-1, ¶ 76, at 15). However, Harms' April 25, 2016 memo was also targeted to "current and new Facility Training Officers," and yet Plaintiff applied for that training. (Dkt. No. 34-10).

"make the selections and notifications" as soon as a date for the training was confirmed. (Dkt. No. 34-1, at 1).

On August 11, 2016, Gardner emailed members of the Sullivan Hub's ION team, stating, "This is your last opportunity to cull the herd! Tell me who you do not want so I can finalize the list and send it to Albany." (Dkt. No. 33-16, at 21–24; *see* Dkt. No. 34-2). A few hours later, Michael Ochs—a sergeant at Wallkill Correctional Facility ("Wallkill") and a member of the ION team—replied: "I am sure you are aware of Corso as a problematic employee . . . ." (Dkt. No. 33-16, at 22, 24; Dkt. No. 34-2). Gardner testified that he did not know what Ochs meant by characterizing Plaintiff as a "problematic employee"; in fact, Gardner said that he did not know anything about Plaintiff at the time. (Dkt. No. 33-16, at 26–27). Gardner also separately spoke with Ochs about the candidates on the list; Ochs told Gardner that Plaintiff would not be a "good pick" for the team because of a "personality conflict." (*Id.* at 29). At his deposition, Ochs stated that he personally did not have any problems with Plaintiff when she worked at Wallkill,[7] but it was reported to him that she had had confrontations with other staff and twice complained about job assignments. (Dkt. No. 33-15, at 37–40). Ochs testified that he did not know about Plaintiff's complaints about gender discrimination in the draft unit. (*See* Dkt. No. 33-15, at 13–14).

Ultimately, Gardner did not choose Plaintiff to join the ION team. (Dkt. No. 33-16, at 31). He testified that his decision was based on Ochs's suggestion and other supervisors' "better recommendations to Siatowski and Hassell . . . [t]hat they would [be] a better fit for our team than Officer Corso would." (*Id.* at 31–32). At his deposition, Gardner could not recall if anyone had mentioned Plaintiff's discrimination complaints. (*Id.* at 33–34). Asked if anyone had

---

[7] According to a performance evaluation for Plaintiff covering the year 2011 and signed by Ochs in September 2012, Ochs gave Plaintiff a performance rating of "excellent". (Dkt. No. 40-12). Plaintiff was at Wallkill from 2012 to 2015. (*See* Dkt. No. 33-9, at 30).

mentioned her complaints to ODM, Gardner said, "It's possible." (*Id.* at 34). In Gardner's recollection, Ochs did mention that Plaintiff "complain[ed] a lot at work." (*Id.* at 36).

### 4.    Other Trainings

The Amended Complaint asserts that Plaintiff requested training in Critical Incident Street Management ("CISM") in July 2016 but was denied despite her seniority. (Dkt. No. 18, ¶ 35). However, the August 2016 session became full and none of the recommended candidates from Ulster, including Plaintiff, was allowed to attend; only current CISM members have attended CISM training since August 2016. (Dkt. No. 33-28, ¶¶ 92–97).

Additionally, Plaintiff alleges that she submitted an application in February 2017 to join the Crisis Intervention Unit ("CIU") but was denied despite her seniority. (Dkt. No. 18, ¶ 35). The CIU is an emergency response team that specializes in nontactical aspects of disturbance management, including hostage negotiation, intelligence gathering, and support-related activities. (Dkt. No. 33-28, ¶ 98). DOCCS needed to fill the open spot with a supervisor working the "Tour Three" (evening) shift. (*Id.* ¶¶ 118–119, 125, 127). Plaintiff, however, was not a supervisor and worked the "Tour Two" shift. (*Id.* ¶¶ 126, 128). The top three candidates that Callender recommended were supervisors, and two of them worked the "Tour Three" shift.[8] (*Id.* ¶¶ 124, 134). Ultimately, the superintendent selected the number one candidate for the position. (Dkt. No. 33-10, at 228).

In her Amended Complaint, Plaintiff alleges that she requested Employee Assistance Program ("EAP") training in September and November 2016 and that her request was denied despite her seniority. (Dkt. No. 18, ¶ 37). EAP members, who are volunteers, assist staff

---

[8] Plaintiff takes issue with Defendant's assertion that she was rejected due to her lack of qualifications and physical condition. (*See* Dkt. No. 40-1, ¶¶ 121–123, at 23). She points out that, according to his testimony, Callender did not recommend her for the position because of what he perceived as her lack of credibility and "bragging." (*See* Dkt. No. 33-10, at 222–27).

members at Ulster with personal and professional issues and can direct them to the appropriate resources. (Dkt. No. 33-28, ¶¶ 139, 141). Plaintiff was out on worker's compensation when the interviews were conducted. (*Id.* ¶ 145). Ulster's superintendent filled the position in February 2017; neither Callender nor Moss had a role in the selection process. (*Id.* ¶¶ 144, 146).

All in all, Plaintiff received significantly more hours of training than the mandatory minimum of 40 hours in both 2016 and 2017. (*See* Dkt. No. 34-16, -29; *see also* Dkt. No. 33-9, at 61, 149, 212–213; Dkt. No. 33-10, at 159).

### 5. Vacation Slots

Plaintiff alleges in her Amended Complaint that she was denied vacation slots from March to July 2017. (Dkt. No. 18, ¶ 40). It is undisputed that Plaintiff was out on worker's compensation in March 2017, (Dkt. No. 33-28, ¶ 160), and that, with regard to the requests for vacation slots submitted between April and July 2017, either Plaintiff could not fill the positions or she was in fact assigned to the posts she requested. (*Id.* ¶¶ 161–175).

### 6. Preferential Posts

Since June or July 2017, Plaintiff has worked as a training relief officer, substituting for officers who are absent for training. (Dkt. No. 34-4, ¶ 69; Dkt. No. 33-19, at 139). According to the Amended Complaint, a training relief officer may request which officer she wishes to relieve based on seniority; yet Plaintiff's requests for preferential posts have allegedly been denied. (Dkt. No. 18, ¶ 43).

The parties do not dispute that facility needs may require a training relief officer not to be placed in a vacant position, and that, although training relief officers with the most seniority may get their preference for an open post, last-minute changes must sometimes be made. (Dkt. No. 33-28, ¶¶ 185, 187). Plaintiff obtained some of the assignments she requested, (*id.* ¶ 189), but on several occasions Plaintiff's requests were denied because she was not qualified or could not

properly fill the requested position—e.g., a resource officer job, which cannot be filled by a training relief officer based on DOCCS policy, (*id.* ¶¶ 190–196, 203–204). Plaintiff's rate of pay and benefits did not depend on the assignment she obtained. (*Id.* ¶ 202).

## III.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-

moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## IV.    DISCUSSION

### A.    Hostile Work Environment

#### 1.    Legal Standard

To establish a hostile work environment claim under Title VII, Plaintiff must demonstrate harassment on the basis of her sex. 42 U.S.C. § 2000e-2(a). The hostile work environment standard "includes both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014). "To decide whether the threshold has been reached, courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse." *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 203 (2d Cir. 2014) (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)). Thus, the factors courts consider in evaluating whether a hostile work environment exists include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 605 (2d Cir. 2006) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). To survive summary judgment on a hostile work environment claim, a plaintiff must first show "must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment" *Alfano*, 294 F.3d at 374 (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir.2000)). Additionally, the plaintiff must show "a specific basis for imputing the hostile work environment to the employer." *Fitzgerald v. Henderson*, 251 F.3d 345, 357 (2d Cir. 2001).

## 2. Application

Defendant argues that Plaintiff cannot satisfy the objective element of a hostile work environment claim, pointing out that Plaintiff was in draft for less than two work shifts and that the actions allegedly creating a hostile work environment there—the draft officers' refusal to provide guidance on her job duties and their "snide comments"—do not qualify as sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment." (Dkt. No. 33-29, at 8–12). Plaintiff responds that "the male officers were unrelentingly hostile," "she experienced significant psychological trauma due to the treatment she received," and "the treatment plainly interfered with her ability perform her work" as she was "forced to leave her post" and "lost out on the benefits of her seniority rights." (Dkt. No. 40, at 29). She adds that "there is reason to believe" that "she would have subjected to unremitting hostility" had she remained in draft. (*Id.*).

"The question of whether a work environment is sufficiently hostile to violate Title VII is one of fact." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 75 (2d Cir. 2001). But if no reasonable jury could conclude, considering all the circumstances, that "the harassment is of such quality or

quantity that a reasonable employee would find the conditions of her employment *altered for the worse*," *Schiano*, 445 F.3d at 600 (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir. 2000)), a court may conclude as a matter of law that the work environment is not sufficiently hostile to violate Title VII.

Title VII does not impose "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation and internal quotation marks omitted). "Conduct that is merely offensive, unprofessional, or childish cannot support a hostile work environment claim." *Payton v. City Univ. of N.Y.*, 453 F. Supp. 2d 775, 785 (S.D.N.Y. 2006) (internal quotation marks omitted); *accord Zucco v. Auto Zone, Inc.*, 800 F. Supp. 2d 473, 476 (W.D.N.Y. 2011) (noting that "sporadic, isolated incidents of boorish or offensive use of language are insufficient to establish a hostile work environment" (internal quotation marks omitted)). Further, "[i]ncidents that are few in number and that occur over a short period of time may fail to demonstrate a hostile work environment." *Whidbee*, 223 F.3d at 69 (internal quotation marks omitted).

On the present record, even viewed in the light most favorable to Plaintiff, she has failed to identify any sufficiently severe or pervasive misconduct, such as "discriminatory intimidation, ridicule, and insult," *Alfano*, 294 F.3d at 373, that altered her terms and conditions of employment. She complains that, during her one-and-a-half-day stint in the draft unit, draft officers ignored her, isolated her, and failed to instruct her on her job duties. (Dkt. No. 40, at 29). But that short-lived experience does not rise to the level of harassment actionable under Title VII. *See, e.g., Campbell v. Nat'l Fuel Gas Distribution Corp.*, No. 13-cv-00438, 2016 WL

8929078, at *9–10, 2016 U.S. Dist. LEXIS 98344, at *30–31 (W.D.N.Y. July 26, 2016) (ruling that the plaintiff's complaint of being "ignored" every day and given the "cold shoulder treatment" is not sufficiently severe or pervasive to establish a hostile work environment claim), *report-recommendation adopted*, 252 F. Supp. 3d 205 (W.D.N.Y. 2017); *Costello v. N.Y. State Nurses Ass'n*, 783 F. Supp. 2d 656, 680 (S.D.N.Y. 2011) (holding that the incidents complained of, including being "openly ignored" in meetings, were "not sufficiently pervasive or continuous as to alter the conditions of [the plaintiff's] employment"). For the same reason, Plaintiff's argument that she felt "isolated" and "uncomfortable" when she was assigned to draft on subsequent occasions—a contention that notably lacks specificity—fails to satisfy the requisite standard.

Plaintiff also notes that she was the target of hostile comments and "attitudes." (Dkt. No. 40, at 26, 29, 31–32). She recounts three instances in particular: one when she was "denigrated by being told she 'has two fucking legs' which she should use to escort inmates; another when officers disparaged her choice of the wrong table; and a third when inmates reported to her that male officers were making "nasty" comments about her. (*Id.*). Even if the Court infers, based on context, that the comments were gender related, they are but isolated remarks spanning less than a day and a half, and, although unfriendly, they cannot reasonably be deemed to be "extraordinarily severe." *Alfano*, 294 F.3d at 374; *see, e.g.*, *Wilson v. Ontario Cty. Sheriff's Dep't*, No. 12-cv-6706, 2014 WL 3894493, at *7, 2014 U.S. Dist. LEXIS 110618, at *15–17 (W.D.N.Y. Aug. 8, 2014) (holding that a supervisor's criticism of the plaintiff followed by a "nasty message" the following day did not establish a severe or pervasive hostile work environment); *Hawkins v. City of New York*, No. 99-cv-11704, 2005 WL 1861855, at *15–16, 2005 U.S. Dist. LEXIS 15898, at *43 (S.D.N.Y. Aug. 4, 2005) (concluding that the alleged

"unkind" comments were "so isolated that they do not meet the threshold for a hostile work environment claim"). "[R]un-of-the-mill workplace conflicts, troubling though they may be, do not rise to the level of an objectively hostile workplace." *Harvin v. Manhattan & Bronx Surface Transit Operating Auth.*, 767 F. App'x 123, 128 (2d Cir. 2019) (affirming dismissal of hostile work environment claim premised on "rude and hostile" behavior by supervisor on "various occasions").

The Court therefore finds that Plaintiff has failed to raise a genuine issue of fact about the existence of an objectively hostile work environment, and that this claim must be dismissed.

### B. Gender-Based Employment Discrimination

#### 1. Legal Standard

Discrimination claims under Title VII are generally evaluated under the *McDonnell Douglas* burden-shifting analysis. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 92 (2d Cir. 2013); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). First, the plaintiff must establish, by a preponderance of the evidence, a prima facie case of discrimination. *Hicks*, 509 U.S. at 506. "The requirements to establish a prima facie case are 'minimal,' and a plaintiff's burden is therefore 'not onerous.'" *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 128 (2d Cir. 2012) (citation omitted) (first quoting *Hicks*, 509 U.S. at 506; then quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). The establishment of a prima facie case creates a presumption that the employer unlawfully discriminated against the employee. *Hicks*, 509 U.S. at 506. The burden then shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for its actions. *Id*. at 507. If the defendant carries that burden, the presumption of discrimination "drops from the picture," and the burden shifts back to the plaintiff, who must "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere

pretext for actual discrimination." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000); *see Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 845 (2d Cir. 2013). "The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action]." *Weinstock*, 224 F.3d at 42 (alterations in original) (internal quotation marks omitted).

To establish a prima facie case of employment discrimination under Title VII, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination. *Bennett v. Hofstra Univ.*, 842 F. Supp. 2d 489, 497 (E.D.N.Y. 2012) (citing *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 491–92 (2d Cir. 2009)). "A plaintiff can meet that burden through direct evidence of intent to discriminate, or by indirectly showing circumstances giving rise to an inference of discrimination." *Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 87 (2d Cir. 2015) (citation omitted).

While it is undisputed that Plaintiff satisfies the first and second prongs to the extent that she is a female qualified for the position of correction officer, Defendant maintains Plaintiff cannot meet the other prongs. (*See* Dkt. No. 33-29, at 17–20). Plaintiff contends that the *McDonnell Douglas* framework does not apply because "the record contains direct evidence of discrimination." (Dkt. No. 40, at 20). But whether or not the *McDonnell Douglas* framework applies, any Title VII case requires proof of an adverse employment action. *See Shultz v. Congregation Shearith Israel of City of N.Y.*, 867 F.3d 298, 304 (2d Cir. 2017); *see also Cameron v. N.Y.C. Dep't of Educ.*, No. 15-cv-9900, 2018 WL 1027710, at *8, 2018 U.S. Dist.

LEXIS 27863, at *21 (S.D.N.Y. Feb. 21, 2018) ("Because Cameron has provided direct evidence of discrimination, *McDonnell* is inapplicable. The only question, therefore, is whether Cameron suffered an 'adverse employment action' as a result of DOE's discrimination."); *Patrolmen's Benevolent Ass'n of City of N.Y., Inc. v. City of New York*, 74 F. Supp. 2d 321, 333 (S.D.N.Y. 1999) (explaining that the *McDonnell Douglas* framework does not apply where there is direct evidence of discrimination, but noting that the plaintiff's "burden includes proving by a preponderance of the evidence, as in any other Title VII case, that plaintiffs' involuntary transfer constitutes an adverse employment action").

### 2.     Adverse Employment Action

Defendant argues that Plaintiff cannot show she suffered "'a materially adverse change in the terms and conditions of employment,' which can include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities,' among other possibilities." (Dkt. No. 33-29, at 17 (quoting *Campbell v. N.Y.C. Transit Auth.*, 93 F. Supp. 3d 148, 168 (E.D.N.Y. 2015), *aff'd*, 662 F. App'x 57 (2d Cir. 2016))). Plaintiff counters that her "effective exclusion from draft constituted a materially adverse change in the terms and conditions of her employment because it materially impacted her right to certain job assignments based upon her seniority." (Dkt. No. 40, at 22).

The focus of Plaintiff's claim is that "the male officers caused her to relinquish that post." (*Id.* at 23). In other words, the adverse employment action alleged here is Defendant's creation of a hostile work environment that caused Plaintiff to leave her assignment.[9] But even if there were

---

[9] Plaintiff does not allege a discriminatory denial of a preferential assignment. In fact, Plaintiff requested (and obtained) assignment to the draft unit.

evidence sufficient to support a hostile work environment claim—there is not, *see supra* Part IV.A—an employment discrimination claim under Title VII requires a discrete adverse employment action. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) (distinguishing the discrete acts supporting disparate treatment claims from the "repeated conduct" underlying hostile work environment claims); *Simmons-Grant v. Quinn Emanuel Urquhart & Sullivan, LLP*, 915 F. Supp. 2d 498, 503 (S.D.N.Y. 2013) ("In *Morgan*, the Supreme Court characterized an actionable adverse employment action as a 'discrete' harm which occurs at one particular time, as contrasted with the ongoing harm of a hostile work environment."); *cf. Saliga v. Chemtura Corp.*, No. 12-cv-832, 2015 WL 5822589, at *7, 2015 U.S. Dist. LEXIS 133135, at *21 (D. Conn. Oct. 1, 2015) ("[I]n the context of disparate treatment claims, the creation of a hostile work environment cannot constitute an adverse employment action for purposes of establishing a *prima facie* case of discrimination.").

Plaintiff fails to single out any discrete act that rises to the level of an adverse employment action. An adverse employment action is one that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). "To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 639–40 (2d Cir.2000) (internal quotation marks omitted). None of the discrete acts done by Plaintiff's coworkers in the draft unit on February 29 and March 1, 2016—such as their failure to train her, their cold-shoulder treatment, and the hostile comments made or reported to Plaintiff—materially altered Plaintiff's terms and conditions of employment. *See Miksic v. TD Ameritrade Holding Corp.*, No. 12-cv-

4446, 2013 WL 1803956, at *3, 2013 U.S. Dist. LEXIS 63254, at *10–11 (S.D.N.Y. Mar. 7, 2013) (holding that allegations of being "isolated," "no longer given information such that [the plaintiff] was able to adequately perform his job," and verbal harassment were not tantamount to adverse employment actions). Further, nothing in the record suggests that Plaintiff's employment status changed in connection with her assignment in draft; she remained a resource officer before, during, and after her stint there, filling temporary positions that were vacant due to other officers' absences.[10] *See Rodriguez v. Coca Cola Refreshments USA, Inc.*, No. 12-cv-234, 2013 WL 5230037, at *3, 2013 U.S. Dist. LEXIS 131860, at *11–12 (E.D.N.Y. Sept. 16, 2013) (observing that "assignments that are part of an employee's normal responsibilities are not 'adverse employment actions' where, as here, the rate of pay and benefits remains the same"). And there is no evidence that Plaintiff lost benefits due to her draft assignment. Since Plaintiff has not raised a triable issue of fact concerning the existence of an adverse employment action, Plaintiff's gender discrimination claim must be dismissed.

---

[10] Plaintiff does not argue, nor does any evidence in the record suggest, that she was constructively discharged. *See Serricchio v. Wachovia Sec. LLC*, 658 F.3d 169, 185 (2d Cir. 2011) ("Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily. Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.").

Moreover, although Plaintiff claims that, "[b]y being forced to relinquish this post early, she was frustrated in her ability to exercise her seniority rights as she saw fit," (Dkt. No. 40, at 25), there is no dispute that she left her position unilaterally. To the extent that her decision to leave was the result of male officers' hostility, her claim is one for hostile work environment, not employment discrimination. (*See supra* Part IV.A). Lastly, even if the Court adopted Plaintiff's theory that she lost her draft assignment involuntarily, Plaintiff has not adduced evidence that she was reassigned to a materially disadvantageous position. *See Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) ("[A]n involuntary transfer may constitute an adverse employment action if the plaintiff show[s] that the transfer created a materially significant disadvantage with respect to the terms of her employment. . . . [I]f a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer [an] adverse employment action." (second and fourth alterations in original) (internal quotation marks omitted)); *Potash v. Fla. Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 584 (S.D.N.Y. 2013) ("Changes in assignments or responsibilities that do not radical[ly] change the nature of work are not typically adverse employment actions." (alteration in original) (internal quotation marks omitted)).

### C.    Retaliation

Retaliation claims under Title VII must be analyzed under the *McDonnell Douglas* burden-shifting framework. *See Chen v. City Univ. of N.Y.*, 805 F.3d 59, 74 (2d Cir. 2015); *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 681 (S.D.N.Y. 2012). A plaintiff must first establish the four elements of a prima facie case of retaliation: (1) the plaintiff engaged in protected activity; (2) the defendant was aware of the activity; (3) the defendant took an adverse employment action against the plaintiff; and (4) there is a causal connection between the protected activity and the adverse employment action. *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013). Defendant only contests the third and fourth prongs in this case. (*See* Dkt. No. 33-29, at 24–25).

The definition of "adverse employment action" in the retaliation context is "not limited to discrimination actions that affect the terms and conditions of employment," *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006), but rather covers harms that might well have "dissuaded a reasonable worker from making or supporting a charge of discrimination," *id.* at 68 (quoting *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005)). Under this standard, "[m]aterial adversity is to be determined objectively based on the reactions of a reasonable employee." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 25 (2d Cir. 2012). The requirement that the employer's action be materially adverse is meant to separate significant from trivial harms. *White*, 548 U.S. at 68 ("An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."). The perspective is that of a reasonable employee because the harm must be assessed objectively. *Id.*

As for the causal connection required under Title VII, the plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."

*Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). "A causal connection in retaliation claims can be shown either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019) (internal quotation marks omitted).

If the plaintiff establishes a prima facie case, the burden shifts to the employer to demonstrate that a legitimate, nonretaliatory reason existed for its action. *Summa*, 708 F.3d at 129. If the employer demonstrates a legitimate, nonretaliatory reason for the adverse employment action, the burden shifts back to the employee to establish that the employer's action was caused by a retaliatory motive. *Nassar*, 570 U.S. at 362. To satisfy that burden, "the plaintiff must demonstrate that there is sufficient evidence for a reasonable juror to find that the reason offered by the defendant is pretext for retaliation." *Flores v. Entergy Nuclear Operations, Inc.*, 313 F. Supp. 3d 511, 525 (S.D.N.Y. 2018), *aff'd*, 768 F. App'x 139 (2d Cir. 2019). "The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy [the plaintiff's] burden to bring forward some evidence of pretext." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010). Pretext may be shown, among other things, "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate" nondiscriminatory reasons for its action. *Kwan*, 737 F.3d at 846.

### 1. Exhaustion of Administrative Remedies

Before analyzing Plaintiff's retaliation claim, the Court must address Defendant's exhaustion defense. (Dkt. No. 33-29, at 20–22). Plaintiff's Complaint, filed on December 13,

2016, did not include a retaliation claim, (*see* Dkt. No. 1), and it is undisputed that Plaintiff's Amended Complaint added retaliation allegations not included in her EEOC charge, (Dkt. No. 40-1, ¶ 68, at 14; *compare* Dkt. No. 18, *with* Dkt. No. 33-6).

Before bringing a claim under Title VII, a plaintiff must exhaust her administrative remedies by filing a charge with the EEOC. *See* 42 U.S.C. § 2000e-5(e)(1), (f)(1); *Fort Bend County v. Davis*, 139 S. Ct. 1843, 1846 (2019). That requirement is not jurisdictional; instead, it is "properly ranked among the array of claim-processing rules that must be timely raised to come into play."[11] *Fort Bend*, 139 S. Ct. at 1846; *see also id.* at 1851. And although a plaintiff may not pursue an unexhausted claim, courts may "consider all claims to the extent they are 'reasonably related' to those" the plaintiff asserted in a timely EEOC charge. *Mathirampuzha v. Potter*, 548 F.3d 70, 75 (2d Cir. 2008). A claim is reasonably related to allegations in an EEOC charge if "the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Id.* at 76 (quoting *Terry v. Ashcroft*, 336 F.3d 128, 151 (2d Cir. 2003)). The central question is whether the charge filed gave the EEOC "adequate notice to investigate discrimination" on the newly-raised basis. *Id.* at 77 (quoting *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006)). Additionally, subsequent conduct is reasonably related to conduct described in an EEOC charge if the claim

---

[11] Because failure to exhaust is an affirmative defense, *Belgrave v. Pena*, 254 F.3d 384, 386 (2d Cir. 2001), it is properly interposed in an answer to a complaint, *see* Fed R. Civ. P. 8(c); *Canty v. Wackenhut Corr. Corp.*, 255 F. Supp. 2d 113, 117 (E.D.N.Y. 2003) (finding that the defendant had not waived its exhaustion defense because it had raised it in its answer). Here, Defendant timely raised the exhaustion defense in its answer. (Dkt. No. 19, ¶ 58). Plaintiff's argument that Defendant somehow waived or is estopped from asserting its defense because it consented to Plaintiff's filing of an Amended Complaint containing a retaliation claim, (*see* Dkt. No. 40, at 36), is without merit, *see Shaheen v. McIntyre*, No. 05-cv-173, 2007 WL 3274835, at *16, 2007 U.S. Dist. LEXIS 103523, at *79 (N.D.N.Y. Sept. 28, 2007) (rejecting similar argument), *report recommendation adopted*, 2007 WL 3274835, 2007 U.S. Dist. LEXIS 81895 (N.D.N.Y. Nov. 5, 2007); *cf. Coronna v. County of Suffolk*, No. 05-cv-6016, 2008 WL 2371421, at *5 n.2, 2008 U.S. Dist. LEXIS 45075, at *14 n.2 (E.D.N.Y. June 9, 2008) ("Even though the first amended complaint was filed on consent, the then consenting defendants did not waive the [affirmative] defense. . . . [T]hat defense was interposed in the answer to the first amended complaint, as well as in the initial answer.").

concerns "retaliation for filing the EEOC charge" or "further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Alfano*, 294 F.3d at 381 (quoting *Butts v. N.Y.C. Dep't of Hous. Preservation and Dev.*, 990 F.2d 1397, 1402–03 (2d Cir. 1993)).

First, Defendant refers to Plaintiff's July 6, 2016 EEOC charge—in which Plaintiff checked the box marked "sex" as the basis of discrimination, left the "retaliation" box blank, and described the hostile work environment she was subjected to in draft, (Dkt. No. 33-6)—and contends that the description "would not have reasonably alerted the EEOC to the retaliation claims Plaintiff later made" concerning denial of training and assignment opportunities. (Dkt. No. 33-29, at 21). Second, Defendant argues that, beyond conclusory assertions, Plaintiff has not alleged "any link between the retaliatory conduct and the filing of her EEOC charge." (*Id.*). And third, Defendant asserts that the retaliation claim does not concern further incidents of discrimination similar to those alleged in the EEOC charge, as the allegations of denial of training and assignment opportunities are "clearly not of the same type" as her allegations of a hostile work environment in the draft unit. (*Id.* at 22). In response, Plaintiff argues that her retaliation allegations are reasonably related to her "internal complaints to DOCCS and external complaint to the EEOC" concerning gender discrimination in the draft unit because the retaliation occurred after she made her complaints and while the EEOC charge was pending. (Dkt. No. 40, at 37–38).

The record contains at least two instances of training requests—regarding FTO and Disciplinary trainings—that were denied before Plaintiff filed her EEOC charge in July 2016. (*See* Dkt. No. 33-28, ¶¶ 69–70; Dkt. No. 33-9, at 145–46; Dkt. No. 34-12). Because the charge specifically focused on the allegedly hostile work environment in the draft unit and did not mention retaliatory events that preceded the filing of the charge, nothing in it would have

"compel[led] the EEOC to broaden the scope of its investigation to include possible" retaliation. *Smering v. FMC Corp.*, No. 01-cv-721, 2004 WL 2191561, at \*9, 2004 U.S. Dist. LEXIS 19924, at \*25 (W.D.N.Y. Sept. 24, 2004); *see Samimy v. Cornell Univ.*, 961 F. Supp. 489, 492 (W.D.N.Y.1997) (finding that, where there was specificity in the charge, a reasonable EEOC investigation would begin and end with the charges specified). Therefore, the alleged denials of FTO and Disciplinary trainings are not reasonably related to the allegations in her EEOC charge, and Plaintiff has failed to exhaust her administrative remedies with respect to those denials.

The other retaliation allegations in the Amended Complaint concern denials of training and preferential post requests that occurred during the pendency of the EEOC investigation, after the issuance of the right-to-sue letter, or the pendency of this action. Addressing post-charge retaliation claims, the Second Circuit explained:

> Although we have not previously had occasion to make clear that "reasonably related" retaliation claims are excused from the exhaustion requirement *only* if they arise during the pendency of an EEOC investigation *or* a timely filed federal case, that outcome is consistent with Title VII's statutory scheme and our existing case law. . . .
>
> . . .
>
> In sum, retaliation claims arising during or after an EEOC investigation are deemed exhausted when a plaintiff seeks to join them to a timely filed lawsuit on his original, exhausted claims, because it would be burdensome and wasteful to require a plaintiff to file a new EEOC charge instead of simply permitting him to assert that related claim in ongoing proceedings to adjudicate the underlying charge.

*Duplan v. City of New York*, 888 F.3d 612, 624 (2d Cir. 2018). In this case, Plaintiff's failure to assert a retaliation claim in her original Complaint is puzzling, but ultimately she amended her pleading. Because Plaintiff alleges that the denials were retaliation for her filing "external" complaints—i.e., the EEOC charge and the original Complaint in this action, (Dkt. No. 18, ¶¶ 8–

11, 50)— they are reasonably related to the discrimination claim raised in the EEOC charge and this action. Accordingly, her retaliation claim with respect to the post-charge denials is exhausted.

### 2. Analysis Under *McDonnell Douglas* Framework

As an initial matter, the Court notes that Plaintiff's opposition brief does not attempt to support her retaliation claim for training requests other than for "three specific trainings"—the FTO, Disciplinary, and ION trainings. (*See* Dkt. No. 40, at 41–44). She has thus abandoned that claim with respect to other training denials.[12] *See Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."). Further, as discussed above, Plaintiff did not exhaust her retaliation claim with regard to the FTO and Disciplinary trainings, which preceded Plaintiff's EEOC charge. That leaves only the denial of her ION training request. As for the remainder of her claim, Plaintiff argues in her brief that she has established retaliation for denials of vacation slots and "certain requested job posts as a TRO," but that is the full extent of her briefing on these issues. (Dkt. No. 40, at 41). The Court will assess the evidence in support below.

---

[12] Plaintiff's exhausted retaliation claim for the other trainings would fail in any event because, even assuming she established a prima facie case on those claims, Defendant provided legitimate, nonretaliatory reasons for denying her requests, and Plaintiff failed to raise a triable issue of fact as to pretext. (*See, e.g.*, Dkt. No. 33-28, ¶¶ 92–97 (CISM training session became full, and none of the recommended candidates from Ulster were able to attend); *id.* ¶¶ 118–119, 124–128 (open spot on CIU team was for a supervisor working the evening shift, which criteria Plaintiff did not satisfy); *id.* ¶¶ 139–146 (Plaintiff was out on worker's compensation when the interviews for the EAP volunteer position were conducted, and neither Callender nor Moss had a role in the selection process)). Further, Plaintiff cannot claim that Defendant deprived her of training opportunities in general; she received significantly more training than the average officer in 2016 and 2017. (*See* Dkt. No. 34-16, -29; *see also* Dkt. No. 33-9, at 61, 149, 212–213; Dkt. No. 33-10, at 159).

### a. ION Training

After Plaintiff requested ION training in June 2016, Ulster's deputy superintendent of security, Roy Snyder, recommended Plaintiff and seven other officers to Lieutenant Gardner, the Sullivan Hub's ION team supervisor. (Dkt. No. 33-28, ¶¶ 79–87). There is no dispute that Gardner, who does not work at Ulster, is the official responsible for selecting ION training participants. (*Id.* ¶ 88). Seeking to reduce the pool of candidates, in August 2016, Gardner asked members of the Sullivan Hub's ION team to identify whom they did not want on the team. (Dkt. No. 33-16, at 21–24; *see* Dkt. No. 34-2). Ochs, a sergeant at Wallkill, characterized Plaintiff as a "problematic employee," (Dkt. No. 34-2), and he later elaborated to Gardner that she would not be a "good pick" for the team because of a "personality conflict," (Dkt. No. 33-16, at 29), by which he was referring to reported confrontations she had had with other staff and her complaints about job assignments when she worked at Wallkill, (Dkt. No. 33-15, at 37–40). In the end, in November 2016, Gardner decided not to select Plaintiff based on his communications with Ochs and other supervisors. (Dkt. No. 33-15, at 31–32).

Attempting to connect the dots between her discrimination complaints and Gardner's ultimate decision not to pick her for the ION training, Plaintiff cites Gardner's deposition testimony that he could not recall if anyone had mentioned Plaintiff's discrimination claim and that it was "possible" that someone brought up her complaints to ODM. (Dkt. No. 40, at 43 (citing Dkt. No. 33-16, at 33–34)). But even assuming that Plaintiff has established a prima facie case of retaliation with respect to the ION training, the Court finds that she has failed to raise a material issue of fact as to pretext. Defendant advanced legitimate, nonretaliatory reasons for not selecting her—specifically, Ochs relayed reports that she was a confrontational employee who had complained about job assignments when she was working at Wallkill, before she worked at Ulster; by contrast, the two officers that were ultimately selected received favorable

recommendations from supervisors. (*See* Dkt. No. 33-16, at 26–27, 29; Dkt. No. 34, ¶ 15). Although Plaintiff disputes the basis for the negative reports, Ochs simply reported to Gardner what he knew or had heard about Plaintiff's track record at Wallkill. (*See* Dkt. No. 33-15, at 37–40). Plaintiff points to no evidence that he did so for retaliatory reasons. Indeed, Ochs testified that he did not know about Plaintiff's gender discrimination complaint at Ulster. (*See* Dkt. No. 33-15, at 13–14). Plaintiff has failed to come forward with sufficient admissible evidence that her nonselection was due to retaliatory animus as opposed to Defendant's asserted reasons.[13] Accordingly, denial of ION training cannot support her retaliation claim.

### b.    Vacation Slots

Although Plaintiff alleges that she was denied vacation slots from March to July 2017, the record indisputably shows that she was out on worker's compensation in March 2017. (Dkt. No. 33-28, ¶ 160). As for the requested vacation slots from April to July 2017, it is uncontroverted that either the positions were posts that as a matter of policy could not be filled, or Plaintiff was assigned to the positions. (*Id.* ¶¶ 161–175). Plaintiff cites no evidence from which a reasonable factfinder could conclude that the reasons she was denied vacation slots were pretextual. Therefore, these denials cannot form the basis for Plaintiff's retaliation claim.

### c.    Preferential Posts

Plaintiff alleges that, since she became training relief officer in summer 2017, Defendant has denied her preferential posts in violation of her seniority rights. However, the record shows

---

[13] Plaintiff mentions a "glowing" performance evaluation that Ochs gave her in 2012. (Dkt. No. 40, at 44; *see* Dkt. No. 40-12). That evaluation, however, is not inconsistent with Ochs' later statements to Gardner. First, it is undisputed that Ochs personally never had any problems with Plaintiff when she worked at Wallkill. (Dkt. No. 33-15, at 38). Second, the evaluation dates from 2012, so it does not cover the remainder of Plaintiff's employment at Wallkill from 2012 to 2015. (*See* Dkt. No. 33-9, at 29). The Court cannot infer from such a temporally remote evaluation that subsequently relayed criticism of Plaintiff's professionalism was pretextual. *Cf. Jarnutowski v. Pratt & Whitney*, 103 F. Supp. 3d 225, 238 (D. Conn. 2015) ("Courts have recognized that prior positive performance evaluations cannot, without more, demonstrate that later negative evaluations are pretextual.").

that Plaintiff's requests were denied because she was not qualified or could not properly fill the requested position (such as a resource officer job, which cannot be filled by a training relief officer). (*See* Dkt. No. 33-28, ¶¶ 190–196, 203–204). Again, Plaintiff has adduced no evidence calling into question the basis for Defendant's denial of preferential posts. Accordingly, those denials cannot form the basis for a retaliation claim.

In sum, as Plaintiff's retaliation claim is unexhausted or otherwise unsupported by evidence in the record under the *McDonnell Douglas* framework, the Court grants Defendant's motion for summary judgment dismissing the claim.

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 33) is **GRANTED**; and it is further

**ORDERED** that the Amended Complaint (Dkt. No. 18) is **DISMISSED with prejudice** in its entirety.

**IT IS SO ORDERED.**

Dated: July 3, 2019
       Syracuse, New York

Brenda K. Sannes
U.S. District Judge